UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

MIRIAM L. CRAWFORD,

               Plaintiff,

      v.

MICHAEL J. ASTRUE,[1]
COMMISSIONER OF SOCIAL SECURITY,

               Defendant.

_____

**DECISION & ORDER**

13-CV-6068P

## PRELIMINARY STATEMENT

        Plaintiff Miriam L. Crawford ("Crawford") brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying her applications for Supplemental Security Income and Disability Insurance Benefits ("SSI/DIB"). Pursuant to 28 U.S.C. § 636(c), the parties have consented to the disposition of this case by a United States magistrate judge.  (Docket # 10).

        Currently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  (Docket ## 12, 13).  For the reasons set forth below, this Court finds that the decision of the Commissioner is supported by substantial evidence in the record and complies with applicable legal standards.  Accordingly, the Commissioner's motion for judgment on the pleadings is granted, and Crawford's motion for judgment on the pleadings is denied.

_____

[1]  After the commencement of this action, on February 14, 2013, Carolyn W. Colvin became Acting Commissioner of Social Security.

## BACKGROUND

### I.    Procedural Background

Crawford applied for SSI/DIB alleging disability beginning on January 1, 2009, due to depression, a learning disability, and ankle and knee pain and swelling. (Tr. 141-51).[2]  On July 1, 2010, the Social Security Administration denied Crawford's claims for benefits, finding that she was not disabled. (Tr. 85-92).  Crawford requested and was granted a hearing before Administrative Law Judge David S. Lewandowski (the "ALJ"). (Tr. 93-94, 134-35).  The ALJ conducted a hearing on August 25, 2011. (Tr. 26-56).  Crawford was represented at the hearing by her attorney, Kelly Laga, Esq. (Tr. 26, 107).  In a decision dated October 3, 2011, the ALJ found that Crawford was not disabled and was not entitled to benefits. (Tr. 12-21).

On December 20, 2012, the Appeals Council denied Crawford's request for review of the ALJ's decision. (Tr. 1-4).  Crawford commenced this action on February 11, 2013 seeking review of the Commissioner's decision. (Docket # 1).  Crawford had previously applied for benefits, which the Commissioner denied by final decision dated May 13, 2009. (Tr. 218).

### II.    Non-Medical Evidence

#### A.    Crawford's Applications for Benefits

Crawford was born on August 9, 1970 and is now forty-four years old. (Tr. 141). Crawford graduated from high school in 1989 and completed certified nursing assistant ("CNA") training in 2004. (Tr. 208).  Crawford's previous work history includes employment as a security guard, resident counselor, a CNA or home health aide, and a cleaner. (Tr. 209).

---

[2] The administrative transcript shall be referred to as "Tr. __."

Crawford was employed as a resident counselor for the Department of Health from 1994 through 1997.  (*Id.*).  Next, Crawford worked as a security guard for a security company from 1997 until 1999.  (*Id.*).  For the following six years, from 1999 through 2005, Crawford worked as a CNA or home health aide for various nursing homes.  (*Id.*).  Finally, from January 2004 through February 2010, Crawford performed cleaning services for a nursing home.  (*Id.*).

Crawford has two children.  (Tr. 142).  At the time of her application, Crawford reported that she was able to prepare meals on a daily basis.  (Tr. 200).  According to Crawford, it takes approximately one hour to prepare a meal, and she now sits in a chair while cooking. (*Id.*).  Crawford performs household chores with the help of her daughter and goes outside approximately five days per week.  (Tr. 201).  Crawford has a driver's licence, but does not drive because it hurts her legs.  (*Id.*).  Crawford is able to leave the house without assistance and is able to shop for groceries and clothing.  (Tr. 201-02).  According to Crawford, she is able to manage her finances and handle a savings account.  (*Id.*).  Crawford reported that her hobbies include reading and sewing, which she engages in "all the time."  (*Id.*).

Crawford attends a class at Rochester Mental Health five times a week and does not have any problems interacting with others.  (Tr. 203-04).  According to Crawford, her medications have eliminated any effects from stress or changes in her schedule.  (Tr. 205). Crawford contends that her impairments have limited her ability to walk and that activities such as lifting, standing, walking, sitting, climbing stairs, kneeling, squatting and reaching sometimes cause her pain.  (Tr. 203).  Crawford wears a brace to assist her when walking that was prescribed by her physician, David Chazan.  (Tr. 204).  According to Crawford, she is able to

walk for approximately five minutes before needing to rest for approximately thirty minutes.  (*Id.*).

Crawford reports that she has experienced pain in her legs and knees since approximately 2005.  (Tr. 220).  Crawford has been evaluated for her pain symptoms and takes medication to manage the pain.  (Tr. 220-21).  According to Crawford, the medication does not relieve her pain and does not cause any side effects.  (*Id.*).  Crawford reported that when she is in pain, she tries to stay off her legs.  (Tr. 221).

B.    **The Disability Analyst's Assessment**

On June 30, 2010, disability analyst M. Duffy ("Duffy") completed a Physical Residual Functional Capacity Assessment ("RFC").  (Tr. 75-80).  Duffy opined that Crawford could frequently lift ten pounds.  (Tr. 76).  According to Duffy, Crawford could stand or walk for at least two hours during an eight-hour workday and could sit for at least six hours in an eight-hour workday.  (*Id.*).  According to Duffy, Crawford had no limitations in her ability to push or pull.  (*Id.*).  In addition, Duffy opined that Crawford could occasionally climb ladders, ropes or scaffolds.  (Tr. 77).  Duffy opined that Crawford did not have any further physical limitations.  (Tr. 79).  Duffy also opined that the severity of limitations presented by Crawford during her physical consultative examination appeared inflated as compared with the limitations reflected in her medical records.  (*Id.*).

III.    **Relevant Medical Evidence**

A.    **Physical Health Treatment Records**

On January 3, 2005, Crawford had a medical appointment with Rochester Foot Care Associates related to complaints of a swollen ankle.  (Tr. 388).  Crawford was diagnosed

with tendinitis and an ankle sprain. (*Id.*). Treatment notes indicate that Crawford had been examined previously and had been prescribed Medrol. (*Id.*). According to Crawford, the medicine had provided some relief, but Crawford had missed her next three appointments, making it impossible to evaluate her progress. (*Id.*). Crawford was prescribed Mobic and advised to follow-up in two weeks. (*Id.*).

Crawford returned to Rochester Foot Care Associates on January 18, 2005. (Tr. 387). Crawford was assessed to suffer from continued pain and inflammation of both ankles with accompanying tendinitis. (*Id.*). Crawford was advised to continue Mobic, which was working well, and to follow up in four weeks. (*Id.*). Treatment notes suggest that Crawford rescheduled and then cancelled her follow-up appointment. (*Id.*).

In 2008, Crawford received nutrition counseling, weight management treatment and advice regarding a gastric bypass procedure from Oak Orchard Community Health Center. (Tr. 266-82). In addition, Crawford complained of knee pain and requested a referral for physical therapy. (Tr. 272). Xrays taken on May 17, 2008 revealed moderate to marked right patellofemoral joint space narrowing in the right knee and mild medial compartment and marked patellofemoral compartment degenerative osteoarthritis in the left knee. (Tr. 281-82). On June 16, 2008, Crawford reported that the physical therapy sessions were beneficial. (Tr. 274). Physician assistant Karyn Mesiti ("Mesiti") noted that Crawford's knee pain appeared to be improving with physical therapy. (*Id.*).

5

On December 15, 2008, Crawford began receiving treatment from the Culver Medical Group.  (Tr. 392).  On that date, Crawford met Sarah Bolduc ("Bolduc"), MD[3].  (Tr. 393).  Crawford expressed a desire to lose weight and wanted to discuss bariatric surgery.  (Tr. 392).  Crawford was advised to exercise regularly and to maintain a heart healthy diet.  (Tr. 393).

On December 26, 2008, Crawford began treatment with Daniel Tellem ("Tellem"), MD, at Westside Podiatry.  (Tr. 325).  Crawford complained of hammertoe deformities in both feet stating that she had suffered from the deformities since childhood, but that they had become increasingly painful.  (*Id.*).  Upon examination, Tellem noted that Crawford had painless, full range of motion in her ankle joint, subtalar joint and midtarsal joint.  (*Id.*).  Tellem diagnosed Crawford with hammertoes and recommended arthroplasty procedures of all digits in both feet.  (*Id.*).  Treatment notes indicate that Crawford received pre-operative counseling on January 9, 2009 and underwent surgery on her left foot in January 16, 2009.  (Tr. 318-19, 326).  On January 30, 2009, Crawford's sutures were removed.  (Tr. 327).  Tellem determined that Crawford's pins were in excellent alignment, but that they should stay in for another three weeks.  (*Id.*).

On February 9, 2009, Crawford had an appointment with Tellem for removal of the pins in her foot.  (Tr. 328).  The pins were successfully removed, and Tellem prescribed Mederma to be applied to the foot.  (*Id.*).  Crawford attended an appointment on February 16, 2009 for a follow-up examination of her left foot and for a preoperative appointment for the surgery on her right foot.  (*Id.*).

---

[3]  The treatment notes are signed by both Bolduc, the medical resident, and Todd Bingemann, the attending physician.  (Tr. 393).  The treatment notes suggest that Bolduc met with Crawford and then discussed her observations and course of treatment with Bingemann, who agreed with Bolduc's assessment.  (*Id.*).

Crawford had an appointment with Bolduc[4] at Culver Medical Group on February 17, 2009, continuing to express an interest in gastric bypass surgery. (Tr. 394). Crawford reported suffering from migraines approximately twice per month and from depression. (*Id.*). Bolduc opined that she was not inclined to recommend gastric bypass surgery for Crawford because she was not exercising or making healthy food choices. (Tr. 395). In addition, according to Bolduc, Crawford's mental health records indicated that she was diagnosed with "borderline interjectional functioning." (*Id.*). Crawford was advised to consult a nutritionist and to exercise and maintain a healthier diet. (*Id.*). In addition, at her request, Crawford was referred to Rochester Mental Health for treatment. (Tr. 394-95).

On March 20, 2009, Crawford underwent arthroplasty surgery on her right foot. (Tr. 295-96). On March 23, 2009, Crawford was examined by Tellem, who noted that the pins were in perfect alignment. (Tr. 330). Crawford's sutures were removed on April 6, 2009, and her pins were removed on April 14, 2009. (Tr. 331-32). Upon examination and review of xrays, Tellem opined that everything was in "perfect alignment" and that Crawford needed to begin wearing normal shoes. (Tr. 332). During an appointment on May 18, 2009, Crawford complained that her foot was swollen. (Tr. 333). Tellem explained that the swelling would take some time to subside and noted that Crawford was not experiencing any pain. (*Id.*). At the time of the appointment, Crawford continued to wear surgical shoes. (*Id.*). Tellem advised Crawford to wear regular shoes. (*Id.*).

---

[4] The treatment notes are signed by both Bolduc, the medical resident, and Robert J. Fortuna, MD, the attending physician. (Tr. 395). The treatment notes suggest that Bolduc met with Crawford and then discussed her observations and course of treatment with Fortuna, who agreed with Bolduc's assessment. (*Id.*).

On June 1, 2009, Crawford returned to Culver Medical Group complaining of pain in both knees. (Tr. 396). Crawford reported feeling stiffness and pain after prolonged sitting or going up and down stairs. (*Id.*). Crawford explained that ibuprofen controlled her pain and that she wanted a referral to physical therapy, which had successfully alleviated her symptoms in the past. (*Id.*). Upon examination by Enrico Caiola ("Caiola"), MD, he noted no erythemia or swelling of the knees and mild patellar crepitus without instability. (*Id.*). Caiola referred Crawford to physical therapy and prescribed a trial of Naprosyn for pain management. (*Id.*). He advised Crawford to follow-up with Bolduc in six weeks. (*Id.*).

On June 16, 2009, Crawford met with Bolduc[5] in order to obtain a physical examination for a new job. (Tr. 407, 464). Crawford reported suffering from migraines once or twice per week, but declined preventive medication. (*Id.*). With respect to her depression, Crawford reported that she was taking Celexa, that her symptoms were well-controlled and that she had not felt down, depressed or hopeless in the last month. (*Id.*).

On October 20, 2009, Crawford had an appointment with Bolduc[6] at Culver Medical Group and complained of migraines and aneurism, and requested paperwork for social services. (Tr. 399). Treatment notes indicate that Crawford had a history of two cerebral aneurisms. (*Id.*). Crawford reported that she had not had a migraine for the past two weeks, that

---

[5] The treatment notes are signed by both Bolduc, the medical resident, and Robert J. Fortuna, MD, the attending physician. (Tr. 409). The treatment notes suggest that Bolduc met with Crawford and then discussed her observations and course of treatment with Fortuna, who agreed with Bolduc's assessment. (*Id.*).

[6] The treatment notes are signed by both Bolduc, the medical resident, and Brett Robbins, MD, the attending physician. (Tr. 400). The treatment notes suggest that Bolduc met with Crawford and then discussed her observations and course of treatment with Robbins, who agreed with Bolduc's assessment. (*Id.*).

sumatriptan did not relieve her symptoms, but that ibuprofen provided some relief.  (*Id.*).

Treatment notes indicate that Crawford's paperwork for disability was completed.  (*Id.*).

On January 12, 2010, Crawford had another appointment with Bolduc[7]

complaining of popping joints and swelling and pain in her left ankle.  (Tr. 401).  Crawford

reported that her joints were occasionally popping with some discomfort, although there was no

swelling or joint instability.  (*Id.*).  With respect to her ankle, Crawford reported that the pain was

better in the morning and worsened during the day.  (*Id.*).  Upon examination, Bolduc noted that

Crawford maintained full range of motion in her knees and shoulders and that there was no

swelling.  (Tr. 402).  Crawford was positive for nonpitting edema in both her feet and ankles.

(*Id.*).  Boluduc recommended compression stockings for the ankle edema.  (*Id.*).

On March 9, 2010, the record reflects Crawford's first appointment with

Rochester Foot Care Associates since 2005.  (Tr. 458).  During the visit, Crawford complained of

bilateral ankle pain.  (*Id.*).  Crawford was diagnosed with degenerative joint disease and was

fitted for a tri-plane orthotic.  (*Id.*).

On March 16, 2010, Crawford attended another appointment with Bolduc to have

paperwork completed for surgery.  (Tr. 403).  Bolduc completed forms for the bariatric center

and advised Crawford regarding her diet and lifestyle.  (*Id.*).  Bolduc noted that Crawford refused

to submit to an H. pylori test because it might not have been covered by insurance.  (Tr. 404).

---

[7]  The treatment notes are signed by both Bolduc, the medical resident, and Brett Robbins, MD, the attending physician.  (Tr. 402).  The treatment notes suggest that Bolduc met with Crawford and then discussed her observations and course of treatment with Robbins, who agreed with Bolduc's assessment.  (*Id.*).

The following month, on April 22, 2010, Crawford met with Bolduc[8] to request a new prescription for migraines. (Tr. 405). Crawford reported experiencing approximately one migraine per week. Bolduc prescribed atenolol and recommended that Crawford recontact in three weeks if the symptoms persisted. (Tr. 406).

On May 4, 2010, Crawford received her orthotic from Rochester Foot Care Associates. (Tr. 459). She was advised to remove the insert from inside her sneaker and to return in four weeks. (*Id.*).

On June 3, 2010, state examiner Dr. Harbinder Toor ("Toor"), MD, conducted a consultative internal examination of Crawford. (Tr. 417-20). On the day of the examination, Crawford was using a walker with wheels, which she reported had been prescribed by her doctor. (*Id.*). A few days later, the disability analyst assigned to her case, M. Duffy, contacted Crawford to inquire about her use of the walker. (Tr. 231). During the telephone call, Crawford admitted that she had not been prescribed the walker, but had planned to ask her doctor to prescribe one. (*Id.*). According to Crawford, she borrowed the walker and found it helpful. (*Id.*).

During Toor's examination, Crawford reported that she had constant pain in her ankles, feet and knees that she described as constant and sharp. (Tr. 417-20). According to Crawford, she sometimes experiences swelling in the knee and ankles and reported that she suffers from arthritis in both of those areas. (*Id.*). Crawford also complained of a dull, achy pain in her back which she experiences off and on. (*Id.*). According to Crawford she has difficulty standing, walking, sitting, bending, lifting and balancing. (*Id.*). In addition, Crawford

---

[8] The treatment notes are signed by both Bolduc, the medical resident, and Todd Bingemann, MD, the attending physician. (Tr. 406). The treatment notes suggest that Bolduc met with Crawford and then discussed her observations and course of treatment with Bingemann, who agreed with Bolduc's assessment. (*Id.*).

complained of a dull, achy shoulder pain, which she experiences off and on. (*Id.*). Crawford reported that she has arthritis and has difficulty reaching, pushing, pulling and lifting. (*Id.*). Crawford reported that she is unable to cook, clean, do the laundry, shop or care for her children. (*Id.*).[9] Crawford reported that she can sometimes shower, bathe and dress herself. (*Id.*). Crawford also denied watching television, listening to the radio, reading, playing sports, socializing or having any hobbies. (*Id.*).

Upon examination, Toor noted that Crawford was moderately obese and walked with a limp towards the right side. (*Id.*). According to Toor, Crawford refused to walk on her heels or toes, squat, perform straight leg raises, or lie down on the examination table because of pain. (*Id.*). Toor noted that Crawford had difficulty getting out of her chair or standing more than a few minutes without her walker. (*Id.*). Toor noted that Crawford needed a walker because of pain and balancing problems. (*Id.*). In addition, Toor noted that Crawford did not need any assistance changing for the examination. (*Id.*).

Toor noted that Crawford's cervical spine showed full flexion and rotary movement and her lumbar spine had limited flexion with pain. (*Id.*). In addition, Toor noted that Crawford could flex her shoulders 120 degrees and had full rotation in both shoulders, although she had pain in her shoulder. (*Id.*). Toor assessed that Crawford had full range of motion in her left ankle with pain and that in her right foot her plantar flexion and dorsiflexion were twenty degrees with pain. (*Id.*). According to Toor, Crawford also expressed pain in her knees

---

[9]  In the report, under the category for "Activities of Daily Living," Toor listed cooking, cleaning, laundry, shopping and child care followed by the word "none." (Tr. 418).  Toor then listed shower, bathe and dress followed by the phrase "varies with health." (*Id.*).

bilaterally with flexion and extension in both knees at 145 degrees.  (*Id.*).  Toor also noted

tenderness in Crawford's knees and ankles.  (*Id.*).

Toor opined that Crawford had "moderate to severe limitations standing, walking,

squatting or lifting because of pain in the back, knees and ankles."  (*Id.*).  According to Toor,

pain and balance interfere with Crawford's daily physical routine.  (*Id.*).  In addition, Toor opined

that Crawford had moderate limitations sitting for long periods and had moderate reaching

limitations because of pain in her shoulders.  (*Id.*).

On July 22, 2010, Crawford saw Bolduc[10] and discussed her migraines and her

decision to not have gastric bypass surgery.  (Tr. 488).  Crawford reported continuing to

experience migraines twice per week despite taking atenolol.  (*Id.*).  Crawford requested a

prescription for Topamax because it was successful for her sister and requested to see a

specialist.  (*Id.*).  Bolduc referred Crawford to the "HA" clinic to treat her migraines and

counseled Crawford on diet and exercise.  (Tr. 489).

Crawford returned for a follow-up with Bolduc on March 8, 2011.  (Tr. 491).

Crawford reported experiencing migraines approximately twice per week.  (*Id.*).  According to

Crawford, she manages the pain with 600 milligram ibuprofen tablets, which relieve her pain

after one hour.  (*Id.*).  Bolduc refilled the ibuprofen prescription.  (*Id.*).

## B.   **Mental Health Treatment Records**

On June 16, 2009, Crawford began receiving mental health treatment at Rochester

Mental Health Center ("RMHC").  (Tr. 375).  During her visit, Crawford complained that her

_____

[10]  The treatment notes are signed by both Bolduc, the medical resident, and John Chamberlain, MD, the attending physician.  (Tr. 490).  The treatment notes suggest that Bolduc met with Crawford and then discussed her observations and course of treatment with Chamberlain, who agreed with Bolduc's assessment.  (*Id.*).

prescription for Celexa caused her to be tired, agitated and angry. (Tr. 375). Ann Marie

Lagonegro, APRN, recommended decreasing the Celexa dosage from 40 milligrams to 20

milligrams per day. (Tr. 376).

Treatment notes dated June 24, 2009 indicate that Crawford had been treated

during the previous four months at the Rochester Rehabilitation Center, but had switched to

RMHC when her therapist left. (Tr. 372-73). Crawford reported feelings of depression and

angry outbursts which caused her to seek psychiatric care. (*Id.*). Crawford had been prescribed

Citalopram and Abilify and reported feeling tired, but overall believed that she was tolerating the

medication reasonably well. (*Id.*). Crawford recounted historical abuse and neglect causing her

to have trust issues and leading to self-isolation. (*Id.*).

Crawford reported a history of fractured ankles and a recent surgical repair, along

with knee pain. (*Id.*). According to Crawford, Dr. Scofield, her primary care physician, had

prescribed her medication to manage arthritis pain. (*Id.*). Adrian Leibovici ("Leibovici"), MD,

diagnosed Crawford with post-traumatic stress disorder, anxiety disorder not otherwise specified

and depressive disorder not otherwise specified. (Tr. 373). Leibovici continued the prescriptions

for Celexa and Abilify and recommended that Crawford attend the medication clinic to monitor

her medications and continue supportive therapy with Barbara Burke ("Burke"), a licensed social

worker. (*Id.*).

On July 1, 2009, Crawford attended a therapy session with Burke. (Tr. 370).

Crawford reported that she had not been taking Celexa or Abilify, but planned to pick up the

prescriptions the following day. (*Id.*). Burke's notes indicate that Leibovici had increased the

Celexa dosage to 40 milligrams per day.  (*Id.*).  Crawford complained of seeing "shadows."  (*Id.*). Crawford missed her appointment on July 20, 2009.  (Tr. 369).

Between July 27, 2009 and December 23, 2009, Crawford attended multiple therapy sessions and appointments at the medication clinic.  (Tr. 353-67).  During her appointments at the medication clinic, Crawford repeatedly reported a positive effect from her prescribed medications, including Celexa and Abilify, and denied suffering any side effects.  (Tr. 354, 361, 366).  In general, Crawford reported an improvement in her depressive symptoms and denied seeing any shadows or other hallucinations.  (*Id.*).  During therapy sessions, Crawford expressed frustration over her inability to obtain employment and her financial situation.  (Tr. 353, 358-60, 362, 365, 367).  In addition, Crawford complained of her inability to sleep through the night.  (*Id.*).  In July 2009, Crawford reported that her medications were controlling her symptoms and that she was no longer experiencing angry outbursts or hallucinations.  (Tr. 367).

In August and October 2009, Crawford experienced depression relating to her inability to find employment, but thought that her medications continued to help.  (Tr. 360-66). In November 2009, Crawford indicated that she might move to South Carolina.  (Tr. 359).  In addition, Crawford reported experiencing ongoing flashbacks and depressive symptoms related to her inability to obtain employment.  (Tr. 358).  In addition, she was having difficulty getting back into IRPT ("Intensive Psychiatric Rehabilitation Treatment") because she could not arrange child care for her daughter.  (*Id.*).  Crawford was attempting to start a nonprofit group to help girls from troubled homes and continued to consider moving to South Carolina.  (*Id.*).  In December 2009, Crawford reported that she had returned to the IRPT program.  (Tr. 353).

In February 2010, Crawford was discharged from the adult outpatient clinic at RMHC because she had been accepted into the Comprehensive Personalized Recovery Oriented Services at the RMHC Clinic ("PROS") to commence in March 2010.  (Tr. 494-95).  Crawford would continue therapy sessions with Burke in the PROS Program.  (Tr. 494).  At the time of discharge, Crawford continued to be enrolled in the IRPT program and had obtained part-time employment.  (*Id.*).  According to Burke, her diagnosis at discharge included post traumatic stress disorder, rule out mood disorder and psychosis, rule out learning disorder or mild mental retardation, and her GAF was assessed at 41.  (*Id.*).

On April 8, 2010, Burke completed a medical statement addressing Crawford's depression.  (Tr. 378-81).  Burke diagnosed Crawford with Bipolar I Disorder, most recent episodes mixed, recurrent and assessed her GAF at 50.  (*Id.*).  Burke opined that Crawford expressed the following symptoms: appetite disturbance with change in weight; sleep disturbance; psychomotor retardation; decreased energy; feelings of guilt or worthlessness; difficulty concentrating or thinking; thoughts of suicide when not on medication; and visual hallucinations, delusions or paranoid thinking.  (*Id.*).  Burke also opined that Crawford had deficiencies of concentration, persistence or pace, which would require her to take breaks.  (*Id.*).  According to Burke, Crawford had moderate limitations in her ability to perform activities of daily living and in maintaining social functioning.  (*Id.*).

With respect to work-related activities, Burke opined that Crawford was moderately limited in her ability to remember locations and work-like procedures; to understand and remember detailed instructions; to carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular

attendance and be punctual within customary tolerances; to work in coordination with and

proximity with others without being distracted by them; to make simple work-related decisions;

to interact appropriately with the general public; to accept instructions and respond appropriately

to criticism from supervisors; to get along with coworkers or peers without distracting them or

exhibiting behavioral extremes; to maintain socially appropriate behavior and adhere to basic

standards of neatness and cleanliness; to respond appropriately to changes in the work setting; to

be aware of normal hazards and take appropriate precautions; and, to set realistic goals or make

plans independently of others. (*Id.*). In addition, Burke opined that Crawford suffered from

marked limitations in her ability to complete a normal workday and work week without

interruptions from psychologically-based symptoms and to perform at a consistent pace without

an unreasonable number and length of rest periods. (*Id.*).

On June 3, 2010, state examiner Dr. Adele Jones ("Jones") conducted a

consultative psychiatric evaluation of Crawford. (Tr. 421-25). During the evaluation, Crawford

reported that she lived alone with her two daughters, aged seventeen and four. (*Id.*). Crawford

reported that she graduated from high school, but was in special education classes due to her

learning disability throughout her education. (*Id.*). Crawford reported that she completed her

CNA training in 2004 and had not been working since 2009 when she quit her job due to

problems with her legs. (*Id.*). Crawford reported that she has difficulty sleeping and experiences

symptoms of depression, including crying, loss of interest, irritability, diminished sense of

pleasure and social withdrawal. (*Id.*). She also reported a history of manic symptoms, including

decreased need for sleep and spending sprees. (*Id.*). According to Crawford, she experiences

visual and auditory hallucinations, including command hallucinations, but her medications

appear to help.  (*Id.*).  Crawford reported abuse during childhood and post traumatic stress disorder symptoms, including flash backs, hyperstartle, hypervigiliance and inability to trust others.  (*Id.*).  Finally, Crawford reported short-term memory deficits.  (*Id.*).

According to Crawford, she is able to dress, bathe and groom herself, although she stays in bed all day twice a week due to depression.  (*Id.*).  She can cook and clean with assistance from her daughter, and her sister does her laundry.  (*Id.*).  Crawford reported that she can grocery shop with a motorized cart and needs someone to accompany her.  (*Id.*).  In addition, Crawford reported that a case manager assists her to manage her finances.  (*Id.*).  Crawford reported that she spends most of her days at her PROS program.  (*Id.*).

Upon examination, Jones noted that Crawford appeared appropriately dressed and was using a walker, which she reported having used for the previous year.  (*Id.*).  Jones opined that Crawford had fluent, clear speech with adequate language, coherent and goal-directed thought processes with no evidence of hallucinations, delusions or paranoia, restricted affect, dysthymic mood, clear sensorium, full orientation, and low average intellectual functioning with a general fund of information that is appropriate to her experience.  (*Id.*).  Jones noted that Crawford's attention and concentration were intact with counting and simple calculations.  (*Id.*).  According to Jones, Crawford had difficulties with serial threes, likely due to her history of a learning disability.  (*Id.*).  Jones found Crawford's recent and remote memory skills with three objects intact; however, she could complete only four digits forward and three back, again likely due to her history of a learning disability.  (*Id.*).

According to Jones, Crawford could follow and understand simple directions and instructions, perform simple and complex tasks independently, maintain attention and

17

concentration and a regular schedule, learn new tasks, make appropriate decisions, relate adequately with others and appropriately deal with stress.  (*Id.*).  According to Jones, Crawford's ability to maintain activities of daily living might be negatively impacted by her physical impairments.  (*Id.*).  Jones was uncertain as to why Crawford needed a case manager to maintain her finances.  (*Id.*).  According to Jones, Crawford's prognosis was good, given continued treatment.  (*Id.*).

On June 14, 2010, agency medical consultant Dr. L. Blackwell ("Blackwell") completed a Psychiatric Review Technique.  (Tr. 427-40).  Blackwell concluded that Crawford's mental impairments did not meet or equal a listed impairment.  (Tr. 430, 432).  According to Blackwell, Crawford suffered from moderate limitations in her ability to maintain concentration, persistence or pace and suffered from mild limitations in her activities of daily living and ability to maintain social functioning.  (Tr. 437).  In addition, according to Blackwell, Crawford had not suffered any episodes of deterioration.  (*Id.*).  Blackwell completed a mental RFC assessment. (Tr. 441-44).  Blackwell opined that Crawford suffered from moderate limitations in her ability to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, complete a normal workday or week without interruption, interact appropriately with the general public, accept instructions and respond appropriately to criticism, and respond appropriately to changes in the work setting.  (*Id.*). Blackwell adopted Jones's opinions that Crawford can follow, understand and execute simple and complex directions, learn new tasks, make appropriate decisions, handle her own finances, maintain her attention and concentration, and relate adequately with others.  (*Id.*).

On June 21, 2010, Crawford was re-admitted to the adult outpatient clinic at RMHC having been discharged from the PROS program in May 2010 for non-attendance.  (Tr. 501).  Crawford presented as stressed and overwhelmed, reporting that she was going to be evicted from her residence because "DHS" would not pay the amount of rent requested by the landlord.  (*Id.*).  Crawford reported more depressive symptoms and increased difficulty sleeping through the night.  (*Id.*).  Crawford reported that she had been out of medication for the past week, but had not noticed any change in her symptoms.  (Tr. 505).

Treatment notes from that date reveal that Crawford had a difficult childhood and had been living on her own since she was eighteen years old.  (Tr. 501).  She had her first daughter at twenty-one and began working in a factory the following year.  (*Id.*).  Crawford reported working in various occupations until 2008, when she was fired after a felony conviction for taking pay without performing work.  (*Id.*).  Crawford was previously arrested in 2004 for attempting to run over a maintenance man after he used a racial slur.  (Tr. 502).  She was not prosecuted for the alleged crime.  (*Id.*).  Crawford gave birth to her second daughter in 2008.  (Tr. 501).  Upon re-admission to the adult clinic, Burke diagnosed Crawford with bipolar I disorder, recurrent, severe, with psychosis, rule out post traumatic stress disorder, rule out personality disorder, rule out mild mental retardation.  (Tr. 503).  Burke assessed Crawford's GAF to be 51.  (*Id.*).

Crawford missed several appointments in July 2010 and was next seen by Burke for treatment on August 2, 2010.  (Tr. 511-13).  Crawford reported that she had been evicted from her residence and was living in a homeless shelter.  (Tr. 514).  Crawford missed additional appointments in August and September 2010.  (Tr. 517-24).

On November 1, 2010, Crawford had an appointment at the medication clinic and with Burke.  (Tr. 525-27).  Crawford reported that she had been out of medications for the previous two months.  (*Id.*).  Crawford's prescriptions for Celexa, Trazadone and Abilify were restarted.  (*Id.*).  Crawford reported that she continued to have difficulty sleeping and that she was having angry outbursts accompanied by depression.  (*Id.*).  According to Crawford, she had recently moved from the shelter into her own apartment and intended to improve her attendance at RMHC appointments.  (*Id.*).  Crawford attended one more therapy session on November 19, 2010, during which she reported ongoing depression, frustration and anger relating to her inability to obtain employment.  (Tr. 529).  She also reported that she was able to sleep for longer periods of time.  (*Id.*).  Crawford missed several scheduled appointments in November and December 2010.  (Tr. 532-35).

On December 22, 2010, Crawford attended a therapy session with Burke.  (Tr. 536-37).  During the session, Crawford reported that she had stopped taking her medications because they were causing her to gain weight.  (*Id.*).  Crawford reported that she had not noticed any change in her symptoms since discontinuing her medication.  (*Id.*).  According to Crawford, she was not sleeping as well, obtaining approximately five and one-half hours of sleep per night.  (*Id.*).  Crawford reported that she continued to experience mood swings and angered easily.  (*Id.*).  Crawford isolates herself when she gets angry.  (*Id.*).  Crawford missed three additional appointments in January 2011.  (Tr. 539-44).

On January 27, 2011, Crawford attended a therapy session with Burke.  (Tr. 545-46).  During the session, Crawford reported that she continued to experience some depression, but reiterated her belief that medication had not alleviated her symptoms.  (*Id.*).

Crawford continued to express frustration with her lack of employment and with her difficulty

sleeping.  (*Id.*).  Crawford reported that she had been paid to watch a family member's child and

that she continued to apply for jobs, cook, clean and care for her five-year-old daughter.  (*Id.*).

Crawford expressed interest in attending PROS at the DePaul location.  (*Id.*).

   During a therapy session on February 11, 2011, Crawford reported experiencing

increased feelings of depression and requested medication.  (Tr. 548).  According to Crawford,

her ability to sleep had improved and she continued to experience periods of irritability.  (*Id.*).

On February 21, 2011, Crawford attended an appointment with the Med Clinic in order to restart

her medications.  (Tr. 551).

   Crawford attended another therapy session with Burke on March 3, 2011.  (Tr.

552-53).  During the appointment, Crawford reported that she was once again taking Abilify and

Celexa, that she felt better and experienced less anger, although she continued to have difficulty

sleeping more than four hours per night.  (*Id.*).  Crawford complained of chronic physical pain

and continued feelings of depression and hopelessness over her inability to obtain employment.

(*Id.*).  Crawford questioned whether her criminal record might pose less of an obstacle to

employment if she moved to another state.  (*Id.*).

   On March 17, 2011, Crawford attended another session with Burke.  (Tr. 555-56).

During the session, Crawford reported continuing depression despite restarting her medications.

(*Id.*).  Crawford was having difficulty getting out of bed in the morning, although her need to

care for her five-year-old daughter motivated her to get up in the morning.  (*Id.*).  Crawford

reported that she was sleeping almost twelve hours per day and staying in her bedroom much of

the day in order to avoid her sister, who had moved into Crawford's home.  (*Id.*).  Crawford

reported that she was planning to go back to school to renew her CNA.  (*Id.*).

   On March 21, 2011, Crawford had an appointment with Rob Eklund ("Eklund"),

RN, at the Med Clinic.  (Tr. 558).  Crawford reported continued depression and expressed a

desire to discontinue the Abilify.  (*Id.*).  Crawford reported that she was not leaving the house,

although she admitted that she did leave the house in order to shop for groceries and other

supplies.  (*Id.*).  Eklund explained to Crawford that the discontinuation of her medication had

interrupted her treatment and that Crawford was essentially recommencing her medication.  (*Id.*).

   In April 2011, Crawford attended two therapy sessions with Burke and continued

to be monitored by the Med Clinic.  (Tr. 560-69).  Crawford reported ongoing feelings of

depression and continued to express her belief that her medications were not alleviating her

symptoms.  (*Id.*).  Eklund opined that although Crawford perceived herself as depressed, no

clinical symptoms of depression were noted.  (*Id.*).  Crawford reported ongoing stress because

her sister continued to live with her.  (*Id.*).  Crawford reported that she spends time going to the

park and the library and is able to concentrate enough to read and attend to her activities of daily

living.  (*Id.*).  Crawford also reported that she had started attending the PROS program at the

DePaul location and that she had been soliciting local and national companies to request that they

sponsor her daughter on a trip to New York City to search for an agent.  (*Id.*).

   The record reflects that Crawford cancelled her appointments in May 2011, but

attended therapy and Med Clinic appointments in June 2011.  (Tr. 571-73, 581-82).  Crawford

reported ongoing mood swings and depression.  (*Id.*).  Crawford reported that she was attending

the PROS program on Tuesdays and Thursdays and was responsible for handing out coffee as

part of the program.  (*Id.*).  Crawford also reported doing exercise routines.  (*Id.*).


IV.    **Proceedings before the ALJ**

At the administrative hearing, Crawford testified that she lives with her two

daughters, aged eighteen and five.  (Tr. 30-31).  According to Crawford, she graduated from high

school, where she was in special education classes, and attended some college.  (Tr. 31-32).

Crawford successfully completed training to become a CNA, although she testified that her sister

helped her study.  (*Id.*).  Crawford testified that she can read and write and is able to read

newspapers, although she believes her reading skills are not as strong as they should be.  (*Id.*).

Crawford testified regarding her prior employment.  (Tr. 32-38).  According to

Crawford, she was last employed for a few months in 2009 as a cleaner.  (Tr. 32).  Prior to that,

Crawford worked full time as a CNA and a home health aide, both of which required her to do

some lifting.  (Tr. 32-35).  Crawford was also employed as an overnight resident counselor, a

daycare teacher and a security guard.  (Tr. 34-38).  Crawford testified that she does not believe

that she could perform any of her previous jobs.  (Tr. 38).  For instance, according to Crawford,

she did try to work in the cleaning industry, but the work caused her ankle to swell.  (*Id.*).

Similarly, Crawford testified that she would be unable to work as a security guard because of the

walking requirements.  (Tr. 52).  Crawford testified that the pain in her ankles and knees

prohibits her from being employed.  (Tr. 39-40).

Crawford stated that she suffers from arthritis in her knees and ankles and that her

bones "pop" and grind when she stands or walks.  (*Id.*).  In addition, Crawford has a space in one

of her ankles and the other ankle has a bone spur. (Tr. 40). Crawford testified that she had broken her ankle years ago and it never healed properly. (*Id.*). According to Crawford, her ankles and knees swell if she walks more than ten minutes and her medications do not completely relieve her pain, although they permit her to walk. (Tr. 41-42). Crawford also testified that physical therapy had been beneficial. (Tr. 42). According to Crawford, when she experiences swelling, she tries to stay off her feet, although she is frequently unable to do so because she must care for her five-year-old daughter. (Tr. 42-43).

Crawford testified that she is able to bathe and dress herself and care for her youngest daughter, but relies on her older daughter to assist with cooking, cleaning and shopping. (Tr. 43). In addition, Crawford testified that her sister comes over every day and takes her youngest daughter outside every weekend. (Tr. 43-44). Crawford testified that she goes to PROS classes twice weekly on subjects such as anger management, depression and bipolar disorder. (Tr. 44). According to Crawford, she meets with a case manager who takes her shopping and to medical appointments. (Tr. 45). Crawford is able to manage her own bills and can make her own shopping lists with her daughter's assistance. (Tr. 48). Crawford has a driver's license, but does not drive because she is scared that her knee will give out and cause an accident. (Tr. 47). Crawford testified that she can carry light grocery bags, but would have difficulty carrying heavy ones. (Tr. 49).

Crawford testified that she currently is five feet, two inches tall and weighs two hundred seventy pounds. (Tr. 50). According to Crawford, she has tried to reduce her weight by eliminating fried foods and soda from her diet. (*Id.*). Despite her efforts, Crawford testified that

she has gained approximately one hundred pounds in the last year as a result of her medications.[11] (*Id.*).

Crawford testified that she attends therapy sessions every two weeks and is taking Abilify and Celexa to address her mental impairments. (Tr. 45). According to Crawford, the medications have eliminated her hallucinations, but she remains depressed. (Tr. 45-46). Crawford testified that she needs to nap several days each week. (Tr. 46). Crawford does not socialize with her extended family and has a relationship only with her sister and her daughters. (Tr. 47). According to Crawford, she used to experience anger management issues, but believes that she could now successfully manage her anger. (*Id.*).

Crawford also testified that she experiences migraines accompanied by light sensitivity and eye swelling every other day. (Tr. 50). According to Crawford, her migraines last all day and the ibuprofen that she takes to manage her pain is insufficient to relieve her symptoms. (Tr. 51).

A vocational expert, Mr. Mansie ("Mansie"), also testified during the hearing. (Tr. 52-55). The ALJ first asked Mansie whether a person of the same age as Crawford, with the same education and vocational profile, who was able to understand, remember and carry out simple instructions and who was capable of performing sedentary exertional work with occasional postural limitations, but no ladder, ropes or scaffolding climbing, and limited to occasional reaching bilaterally, would be able to perform any of the work that Crawford previously performed. (Tr. 53). Mansie opined that such a person would not be able to perform

---

[11] During the consultative examination on June 3, 2010, approximately one year prior to the hearing date, Toor reported that Crawford weighed two hundred seventy-two pounds. (Tr. 418).

any of Crawford's former positions.  (*Id.*).  According to Mansie, such an individual, however, could perform other regional and national jobs.  (*Id.*).  These jobs include surveillance system monitor, with 16,763 jobs nationally and 63 jobs regionally, and callout operator, with 16,011 nationally and 55 regionally.  Mansie testified that many more positions would be available if the individual were able to perform frequent (as opposed to occasional) reaching.  (Tr. 54).

Crawford's attorney asked Mansie whether an individual would be able to maintain employment if she were absent three days each month.  (Tr. 55).  Mansie testified that if a person were absent more than two days a month, she would not be able to maintain employment.  (*Id.*).

## DISCUSSION

I.   __Standard of Review__

This Court's scope of review is limited to whether the Commissioner's determination is supported by substantial evidence in the record and whether the Commissioner applied the correct legal standards.  *See Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004) ("[i]n reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision"), *reh'g granted in part and denied in part*, 416 F.3d 101 (2d Cir. 2005); *see also Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) ("it is not our function to determine *de novo* whether plaintiff is disabled[;] . . . [r]ather, we must determine whether the Commissioner's conclusions are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard") (internal citation and quotation omitted).  Pursuant to 42 U.S.C. § 405(g), a district

court reviewing the Commissioner's determination to deny disability benefits is directed to accept the Commissioner's findings of fact unless they are not supported by "substantial evidence." *See* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive").  Substantial evidence is defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation omitted).

To determine whether substantial evidence exists in the record, the court must consider the record as a whole, examining the evidence submitted by both sides, "because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams ex rel Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).  To the extent they are supported by substantial evidence, the Commissioner's findings of fact must be sustained "even where substantial evidence may support the claimant's position and despite the fact that the [c]ourt, had it heard the evidence *de novo*, might have found otherwise." *Matejka v. Barnhart*, 386 F. Supp. 2d 198, 204 (W.D.N.Y. 2005) (citing *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983)).

A person is disabled for the purposes of SSI and disability benefits if they are unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A).  When assessing whether a claimant is disabled, the ALJ

must employ a five-step sequential analysis.  *See Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir.

1982) (*per curiam*).  The five steps are:

> (1)     whether the claimant is currently engaged in substantial
>         gainful activity;
>
> (2)     if not, whether the claimant has any "severe impairment"
>         that "significantly limits [the claimant's] physical or mental
>         ability to do basic work activities";
>
> (3)     if so, whether any of the claimant's severe impairments
>         meets or equals one of the impairments listed in Appendix
>         1 of Subpart P of Part 404 of the relevant regulations;
>
> (4)     if not, whether despite the claimant's severe impairments,
>         the claimant retains the residual functional capacity to
>         perform his past work; and
>
> (5)     if not, whether the claimant retains the residual functional
>         capacity to perform any other work that exists in significant
>         numbers in the national economy.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) & 416.920(a)(4)(i)-(v); *Berry v. Schweiker*, 675 F.2d at 467.

"The claimant bears the burden of proving his or her case at steps one through four[;] . . . [a]t

step five the burden shifts to the Commissioner to 'show there is other gainful work in the

national economy [which] the claimant could perform.'"  *Butts v. Barnhart*, 388 F.3d at 383

(quoting *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998)).

A.     **The ALJ's Decision**

In his decision, the ALJ followed the required five-step analysis for evaluating

disability claims.  (Tr. 12-21).  Under step one of the process, the ALJ found that Crawford had

not engaged in substantial gainful activity since January 1, 2009, the alleged onset date.  (Tr. 14).

At step two, the ALJ concluded that Crawford has the severe impairments of osteoarthritis of the

28

bilateral ankles and knees, back pain, obesity, bipolar disorder and post traumatic stress disorder. (*Id.*).  At step three, the ALJ determined that Crawford does not have an impairment (or combination of impairments) that meets or medically equals one of the listed impairments.  (Tr. 15-16).  With respect to Crawford's mental impairments, the ALJ found that Crawford suffered from moderate difficulties in maintaining concentration, persistence or pace and mild limitations in social functioning and activities of daily living.  (*Id.*).  The ALJ concluded that Crawford has the RFC to understand, remember and carry out simple instructions and perform sedentary work, except that she is limited to occasional postural limitations with no ladder, rope or scaffold climbing.  (Tr. 16).  Finally, the ALJ determined that Crawford was unable to perform past work, but that – considering her age, education, work experience, and RFC – jobs existed in significant numbers in the national economy that Crawford could perform.  (Tr. 20-21).  Accordingly, the ALJ found that Crawford is not disabled.  (*Id.*).

### B.   **Crawford's Contentions**

Crawford contends that the ALJ's determination that she is not disabled is not supported by substantial evidence.  (Docket # 13-1).  First, Crawford maintains that the ALJ's physical RFC determination is not supported by substantial evidence because the ALJ erred in assessing and weighing Toor's opinion.  (*Id.* at 17-20).  Further, Crawford contends that in discounting Toor's opinion, the ALJ improperly assessed Crawford's physical RFC without the assistance of any medical opinion.  (Docket # 17 at 2).  Crawford also maintains that the ALJ's mental RFC determination is not supported by substantial evidence because the ALJ erred in assessing and weighing Blackwell's and Jones's opinions.  (Docket # 13-1 at 21-24).  Finally,

Crawford maintains that the ALJ erred by failing to obtain a consultative intelligence examination.  (*Id.* at 24-26).

## II.   Analysis

An individual's RFC is her "maximum remaining ability to do sustained work activities in an ordinary work setting on a continuing basis." *Melville v. Apfel,* 198 F.3d 45, 52 (2d Cir.1999) (quoting SSR 96–8p, 1996 WL 374184, *2 (July 2, 1996)).  When making an RFC assessment, the ALJ should consider "a claimant's physical abilities, mental abilities, symptomology, including pain and other limitations which could interfere with work activities on a regular and continuing basis." *Pardee v. Astrue*, 631 F. Supp. 2d 200, 221 (N.D.N.Y. 2009) (citing 20 C.F.R. § 404.1545(a)).  "To determine RFC, the ALJ must consider all the relevant evidence, including medical opinions and facts, physical and mental abilities, non-severe impairments, and [p]laintiff's subjective evidence of symptoms." *Stanton v. Astrue*, 2009 WL 1940539, *9 (N.D.N.Y. 2009) (citing 20 C.F.R. §§ 404.1545(b)-(e)), *aff'd*, 380 F. App'x 231 (2d Cir. 2010).

### A.   Physical RFC Assessment

I turn first to Crawford's contentions that the ALJ erred by failing to accord greater weight to Toor's opinion and that, by rejecting Toor's opinion, the ALJ created a gap in the record that resulted in an RFC assessment unsupported by any opinion from a medical source.

An ALJ should consider "all medical opinions received regarding the claimant." *See Speilberg v. Barnhart*, 367 F. Supp. 2d 276, 281 (E.D.N.Y. 2005) (citing 20 C.F.R.

§ 404.1527(d)).  When evaluating medical opinions, regardless of their source, the ALJ should

consider the following factors:

> (1)    the frequency of examination and length, nature, and extent
>         of the treatment relationship,
>
> (2)    the evidence in support of the physician's opinion,
>
> (3)    the consistency of the opinion with the record as a whole,
>
> (4)    whether the opinion is from a specialist, and
>
> (5)    whatever other factors tend to support or contradict the
>         opinion.

*Gunter v. Comm'r of Soc. Sec.*, 361 F. App'x 197, 199 (2d Cir. 2010); *see Speilberg v. Barnhart*,

367 F. Supp. 2d at 281 (noting factors are to be considered with regard to non-treating sources,

state agency consultants, and medical experts) (citing 20 C.F.R. §§ 404.1527(d) and (e)); *House

v. Astrue*, 2013 WL 422058, *3 (N.D.N.Y. 2013) ("[m]edical opinions, regardless of the source

are evaluated considering several factors outlined in 20 C.F.R. §§ 404.1527(c), 416.927(c)").

In his decision, the ALJ accorded "little weight" to Toor's assessment of

Crawford's capacity to work on the grounds that the opinion was based primarily on Crawford's

self-report and because Crawford refused to complete portions of the physical examination.  (Tr.

19).  Having reviewed the record, I conclude that the ALJ's determination to afford "little

weight" to Toor's opinion is supported by substantial evidence in the record.

Toor was a non-treating physician who examined Crawford only once prior to

rendering his opinion.  During the examination, Crawford described substantial limitations in her

ability to perform activities of daily living that were inconsistent with the record evidence and

her prior statements of her abilities.  (Tr. 418).  In addition, although the record is devoid of any

31

evidence that Crawford suffers impairments in her back or shoulders, she reported experiencing back pain for the previous ten years and shoulder pain for the previous three years.  (Tr. 417). Further, Crawford arrived for the examination using a walker and falsely informed Toor that she had a prescription for the walker.  (*Id.*).  Finally, Crawford refused to perform much of the examination, including heel and toe walking, squatting and the straight leg raises, and refused to lie down on the examination table.  (Tr. 418).

Toor noted some limitations of motion and flexion in Crawford's lumbar spine, right ankle and knees, but observed full range of motion or otherwise unremarkable motion limitations in Crawford's cervical spine, shoulders, elbows, forearms, wrists and left ankle.  (Tr. 419).  In conducting the examination, Toor repeatedly referred to Crawford's need to utilize the walker due to pain and inability to balance.  (Tr. 418).  Despite being unable to perform a full examination, Toor assessed Crawford's physical limitations, explicitly relying upon Crawford's subjective complaints of pain.  (Tr. 420).

"There is no requirement that the agency accept the opinion of a consultative examiner concerning a claimant's limitations."  *Pellam v. Astrue*, 508 F. App'x 87, 89 (2d Cir. 2013).  This is particularly true where the consultative examiner's opinion is inconsistent with the medical evidence and where the claimant has refused to complete portions of the examination or was otherwise not forthcoming during the examination.  *See id.* at 90.  Further, "[a]lthough a court may not reject medical evidence solely because it relies on a claimant's own subjective accounts . . . [,] neither may a court adopt such evidence without considering whether the claimant's reported symptoms are credible."  *Emery v. Astrue*, 2012 WL 4892635, *6 (D. Vt. 2012) (citing *Green-Younger v. Barnhart*, 335 F.3d 99, 107 (2d Cir. 2003) and *Tonapetyan v.*

*Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001)).  Accordingly, an ALJ may properly discount a

medical opinion that is based solely upon a claimant's subjective complaints where substantial

evidence supports the ALJ's determination that the claimant's complaints are not credible.  *See*

*Tonapetyan v. Halter*, 242 F.3d at 1149 ("[b]ecause the present record supports the ALJ in

discounting [claimant's] credibility, as discussed above, he was free to disregard [examining

physician's] opinion, which was premised on [claimant's] subjective complaints"); *Hanhan v.*

*Colvin*, 2014 WL 2931351, *3 (C.D. Ca. 2014) ("[t]hat [the doctor's] opinion relies so heavily

on [p]laintiff's (and his wife's) reports of his symptoms is itself a basis to reject [the doctor's]

opinion, particularly, as here, when the ALJ found that the [p]laintiff's complaints were 'less

than fully credible'"); *Rosario v. Astrue*, 2013 WL 3324299, *6 (S.D.N.Y. 2013) ("[t]he ALJ

explicitly explained that he afforded the consultative examiner's opinion 'little weight' because it

was based on the plaintiff's subjective complaints of back pain alone"); *House v. Astrue*, 2013

WL 422058 at *3 ("the ALJ explained that the opinion was based solely on [claimant's]

subjective allegations and not supported by the objective medical evidence"); *Mongold v. Astrue*,

2010 WL 2998919, *3 (W.D.N.Y. 2010) ("[t]he ALJ . . . gave limited weight to opinions that

were in response to [p]laintiff's subjective complaints").

　　　　The ALJ determined that Crawford's statements concerning the intensity,

persistence and limiting effects of her symptoms were not credible and concluded that the

"record reflects that the claimant has made inconsistent statements regarding matters relevant to

the issue of disability."  (Tr. 18-19).  The ALJ's determination that Crawford was not credible

has ample support in the record.  First, Crawford's refusal to complete portions of her physical

examination, particularly when coupled with her false statements about the walker during the

examination, support the conclusion that she exaggerated her symptoms or is otherwise not credible. *See Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002) ("[claimant's] efforts to impede accurate testing of her limitations supports the ALJ's determination as to her lack of credibility"); *Bolton v. Astrue*, 2011 WL 1060666, *9 (M.D. Fla. 2011) ("[p]laintiff failed to cooperate during a consultative examination[,] . . . [and] appeared at the examination with two crutches and refused to attempt to walk by herself[;] . . . [e]fforts to impede accurate testing imply a lack of credibility").  The ALJ did not err in concluding that Crawford's allegations of pain that was so intense as to prevent her from attempting portions of the examination are not supported by the record, which reflects sparse treatment for physical impairments, conservative pain management, and daily activities consistent with an ability to attempt the physical examination.

In addition, the record is replete with inconsistent statements by Crawford herself about her alleged disabilities.  Crawford's mental health records reveal that Crawford reported engaging in activities such as going to the park and the library, reading, cooking, shopping, cleaning and caring for her children, including her young daughter.  (Tr. 501, 545, 566). According to Crawford, she was able to provide paid child care to a family member's child.  (Tr. 545).  Yet, during her consultative examinations and during the administrative hearing, Crawford understated her ability to perform similar activities of daily living, contending that she either was unable or required significant assistance to perform such activities.  (Tr. 42-44, 418, 423).

Indeed, Crawford's primary goal during therapy was to "get a job" (Tr. 541) – a goal inconsistent with Crawford's contentions that she is totally disabled.  *See Wheeler v. Astrue*, 2013 WL 718472, *8 (N.D. Ind. 2013) (ALJ properly considered claimant's search for

employment when assessing credibility).  The records demonstrate that Burke, Crawford's social worker, encouraged this goal.  (*See, e.g.*, Tr. 536).  In March 2011, Crawford indicated that she planned to return to school in May to renew her certification as a CNA, an intention inconsistent with her contention that she is unable to perform the physical demands of that job.  (Tr. 555).  Her mental health treatment notes are replete with references to her efforts to obtain employment and her belief that her inability to find a job stemmed not from her alleged disability, but from her criminal record, which included a felony conviction for receiving pay for work that was not performed.  (Tr. 501, 552).  Her conviction, of course, is another factor that diminishes her credibility.  *See Williams v. Comm'r of Soc. Sec.*, 423 F. Supp. 2d 77, 84 (W.D.N.Y. 2006) (ALJ properly considered claimant's criminal history as a factor when assessing claimant's credibility).

That Toor's opinion heavily relied upon Crawford's incredible, self-reported limitations is underscored by the absence of any objective evidence in the record supporting many of the limitations assessed by Toor.  For example, Toor concluded that Crawford had a moderate limitation for prolonged sitting.  (Tr. 420).  Yet, other than a passing reference during one medical visit that Crawford experienced stiffness and pain after prolonged sitting (Tr. 396), nothing in the record supports such a limitation.  In fact, the evidence suggests that Crawford attempts to alleviate her pain by sitting down.  For example, Crawford reported that she now sits when cooking, which takes her approximately one hour.  (Tr. 200).  Similarly, during the hearing, Crawford testifies that when she experiences pain, she sits down to alleviate the pain.  (Tr. 43).

In addition, Toor concluded that Crawford was moderately limited in her ability to reach due to pain in her shoulders.  (Tr. 420).  Crawford explained to Toor that she has arthritis in her shoulders and has experienced pain for the previous three years.  (Tr. 417).  Yet, none of

her treatment notes mention complaints of shoulder pain or a diagnosis of arthritis in her shoulders.  Indeed, as noted by the ALJ, Crawford's treatment records for her physical impairments are sporadic at best and marked by documented evidence of Crawford's non-compliance with treatment instructions and recommendations to attend follow-up appointments.  (*See*, *e.g.*, Tr. 387-88).

Based upon these facts, including Crawford's refusal to complete a significant portion of the examination, her dishonest statements to Toor regarding the walker, her inconsistent statements concerning her ability to perform daily activities, and Toor's reliance upon Crawford's use of the walker and her self-reports of pain, which the ALJ concluded were not credible, I conclude that the ALJ correctly recognized the limited value of Toor's opinion. *See Pellam v. Astrue*, 508 F. App'x at 90 (ALJ properly discounted opinion of consultant where claimant refused to perform portions of examination and was not completely forthcoming during the examination); *Townsend v. Comm'r of Soc. Sec.*, 2012 WL 6628689, *5-6 (W.D. Mich. 2012) (ALJ properly "recognized the [consultative] examination's limited utility given plaintiff's failure to cooperate" and properly discounted the diagnosis of pain disorder where ALJ "found that plaintiff's subjective complaints were not fully credible"); *MKW v. United States Comm'r Soc. Sec. Admin.*, 2012 WL 2930461, *3 (W.D. La.) ("[ALJ] was well justified in affording little weight to the consultative examiner given the lack of objective medical history to support such extreme limitations, and the prior finding that [p]laintiff had likely attempted to exaggerate his symptoms during a similar examination"), *report and recommendation adopted*, 2012 WL 2930933 (W.D. La. 2012); *Pearce v. Sec'y of Health & Human Servs.*, 680 F. Supp. 1264, 1266, 1268 (C.D. Ill. 1988) (claimant's refusal to submit to portions of examination was equivalent of a

36

refusal to meaningfully take part in consultative examination and justified denial of claim for disability), *aff'd*, 871 F.2d 61 (7th Cir. 1989).

Generally, "an ALJ is not qualified to assess a claimant's RFC on the basis of bare medical findings, and as a result an ALJ's determination of RFC without a medical advisor's assessment is not supported by substantial evidence." *Dailey v. Astrue*, 2010 WL 4703599, *11 (W.D.N.Y.) (internal quotation omitted), *report and recommendation adopted*, 2010 WL 4703591 (W.D.N.Y. 2010). Accordingly, "[w]here the medical findings in the record merely diagnose [the] claimant's exertional impairments and do not relate those diagnoses to specific residual functional capabilities . . . [, the Commissioner] may not make the connection himself." *Deskin v. Comm'r of Soc. Sec.*, 605 F. Supp. 2d 908, 912 (N.D. Ohio 2008) (internal quotation omitted). In some circumstances, especially where the medical evidence shows relatively minor physical impairments, "an ALJ permissibly can render a common sense judgment about functional capacity even without a physician's assessment." *House*, 2013 WL 422058 at *4 (internal quotation omitted). In other circumstances, an ALJ's decision to limit or reject a medical opinion may create a gap in the record rendering the ALJ's RFC determination unsupported. *See Suide v. Astrue*, 371 F. App'x 684, 689-90 (7th Cir. 2010) ("it is not the ALJ's evaluation of [the treating physician's] reports that requires a remand in this case[;] . . . it is the evidentiary deficit left by the ALJ's rejection of his reports – not the decision itself – that is troubling"); *see House*, 2013 WL 422058 at *4 (ALJ's proper rejection of treating physician opinion nonetheless necessitated remand because absence of any other medical assessment created evidentiary gap). The rejection of a medical opinion may be particularly problematic where the ALJ has rejected a treating source opinion and has failed to order a consultative

examination. *See Gross v. Astrue*, 2014 WL 1806779, *17-18 (W.D.N.Y. 2014) (remanding for further proceedings where ALJ discounted medical opinion and failed to order consultative examination).

Crawford contends that by discounting Toor's opinion, the ALJ created a gap in the record requiring remand. I disagree. Although the ALJ afforded Toor's medical opinion "little weight," his RFC assessment is remarkably consistent with Toor's opinion. *See Pellam*, 508 F. App'x at 90 (ALJ was not required to supplement the record with medical source statement where ALJ rejected the consultative examiner's opinion, but ultimately accounted in the RFC for most of the limitations assessed by the examiner). Here, the ALJ's RFC accounted for most of the limitations assessed by Toor. First, consistent with Toor's opinion that Crawford suffered from limitations in her ability to walk, stand, squat or lift, the ALJ assessed that Crawford retained the ability to perform sedentary work with occasional postural limitations, but that she could not climb ladders, ropes or scaffolds. (Tr. 16, 420). Next, although the ALJ did not adopt Toor's opinion that Crawford had moderate reaching limitations, his hypothetical to the vocational expert did incorporate an occasional reaching limitation. (Tr. 53-54). Thus, his failure to incorporate that limitation into his RFC was harmless. *See McAnally v. Astrue*, 241 F. App'x 515, 519 (10th Cir. 2007) (ALJ's failure to include limitation in RFC was harmless where vocational expert testified that such limitation would not affect claimant's ability to perform past work); *Pearson v. Astrue*, 2011 WL 5142730, *8 (D. Neb. 2011) ("[a]lthough the ALJ did not include an unskilled work limitation in his RFC assessment, he did address unskilled work in his hypothetical questions to the vocational expert[;] . . . [i]n light of this, the ALJ's failure to include an 'unskilled work' limitation in his RFC determination was harmless").

38

The only limitation identified by Toor that *may* not have been accounted for by the ALJ's RFC assessment was the moderate sitting limitations assessed by Toor.  It is not clear whether the ALJ's assessment that Crawford could perform sedentary work is consistent with Toor's opinion that Crawford had moderate limitations for prolonged sitting.  *Compare Funk v. Astrue*, 2012 WL 501017, *3 (N.D.N.Y. 2012) (rejecting plaintiff's argument that an opinion of "moderate limitations in prolonged sitting" would preclude sedentary work) *with Wojciechowski v. Colvin*, 967 F. Supp. 2d 602, 609 (N.D.N.Y. 2013) (opinion that claimant could sit less than six hours per day was consistent with opinion that plaintiff had "moderate limitation for prolonged sitting").  Even if sedentary work is inconsistent with a moderate sitting limitation, as discussed above, the record is devoid of any objective evidence to support the finding that Crawford suffers from moderate limitations in prolonged sitting.  Accordingly, I conclude that the ALJ's RFC assessment adopted the limitations assessed by Toor that were supported by the evidence and that his decision to afford Toor limited weight did not create a gap in the record. *Pellam*, 508 F. App'x at 90.

In any event, after an independent review of the existing record, including Toor's opinion and the treatment records, I conclude that the ALJ's RFC assessment was supported by substantial evidence.  The record reflects that although Crawford has sought treatment for pain in her knees and ankles, Crawford sought treatment for these impairments only sporadically.  For example, Crawford did not return to Rochester Foot Care Associates to seek treatment for her ankles for a period of five years.  Further, the treatment records suggest that Crawford's physical impairments improved with physical therapy.  Finally, the limited examination performed by Toor revealed that Crawford had full range or otherwise unremarkable range of motion in her

cervical spine, shoulders, elbows, forearms, wrists and left ankle, with some range of motion limitations in her lumbar spine, right ankle and knees.  The ALJ's RFC accounted for Crawford's physical impairments by limiting her to sedentary work with occasional postural limitations. Thus, the ALJ's RFC assessment was reasonable and supported by substantial evidence.  *Pellam*, 508 F. App'x at 91.

Even had the ALJ rejected Toor's opinion, a remand for further proceedings would be inappropriate.  Crawford contends that the ALJ's RFC assessment is not supported by substantial evidence because, after Toor's opinion was discounted, the record contained no medical opinion of her capacity to perform work-related functions.  In essence, Crawford urges that a remand be ordered to obtain a new medical opinion, presumably one from another consultative examiner.  Of course, the claimant bears the burden to establish that she is disabled. *See Mahon v. Bowen*, 1988 WL 66887, *1 (W.D.N.Y. 1988) (citing 42 U.S.C. § 423(d)(5)(A)).

Although an ALJ has the duty to develop the record, *see Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996) ("[b]ecause a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record"), the ALJ in this case fulfilled this duty by ordering the consultative examination.  As discussed above, during that examination, Crawford understated her abilities to perform daily living activities, refused to perform portions of the examination and made false statements about an assistive device, effectively undermining the value of the consultative opinion.  Under these circumstances, a remand to afford Crawford another opportunity to attend a consultative examination is not warranted.  *See Middleton v. Astrue*, 2013 WL 1414882, *11 (D. Or. 2013) ("[t]he ALJ was not required to order new consultations, at public expense, to identify additional possible limitations

40

based solely on an examination in which the claimant appears to have exaggerated his symptoms"); *Shackford v. Astrue*, 2010 WL 3075660, *5 (C.D. Ca. 2010) ("a claimant should not be entitled to further examination if he fails to fully cooperate in the first examination[;] [a]t a minimum, [p]laintiff has a duty to fully cooperate with consultative examinations"); *see also Todd v. Colvin*, 2014 WL 943097, *5 (D. Kan. 2014) ("[a]n ALJ cannot develop a sufficient record on which to . . . make RFC findings when plaintiff refuses to cooperate[;] . . . the ALJ did not err by giving little weight to the opinions of [the treating physician] and making a determination that plaintiff could work based on the ALJ's RFC findings"); *Irizarry v. Astrue*, 2012 WL 177969, *1 (N.D.N.Y. 2012) ("if a claimant, without good cause, fails or refuses to attend and participate in a consultative examination, the ALJ may render a finding of not disabled"); *Kershaw v. Astrue*, 2010 WL 521104, *9 (W.D. Ark. 2010) ("[t]he Social Security regulations clearly state, '[i]f you are applying for benefits and do not have a good reason for failing to take part in a consultative examination or test which we arrange for you to get information we need to determine your disability . . . , we may find that you are not disabled'") (citing 20 C.F. R. § 416.918)).

### B. Mental RFC Assessment

Next, I turn to Crawford's contentions that the ALJ's mental RFC assessment is flawed because the ALJ erred by affording no weight to Blackwell's opinion and by affording significant weight to Jones's opinion. In addition, Crawford contends that the ALJ should have ordered an intelligence examination.

Both examining and non-examining medical consultants' opinions are entitled to evidentiary weight. SSR 96–6p, 1996 WL 374180; 20 C.F.R. §§ 404.1527(a)(2), 404.1513(a)(1).

Thus, I agree with Crawford that the ALJ erred by affording no weight to Blackwell simply because Blackwell did not examine Crawford.  According to Crawford, this error was not harmless because Blackwell determined that she had moderate limitations in twelve categories of mental functioning and the ALJ failed to account for these limitations.  I disagree.  First, although Blackwell noted moderate limitations over various categories of work-related mental functioning, Blackwell adopted Jones's opinion that Crawford can follow, understand and execute simple and complex directions, learn new tasks, make appropriate decisions, manage her finances, maintain attention and concentration, and relate adequately with others.  (Tr. 443).  In other words, despite assessing moderate limitations, Blackwell ultimately concurred with Jones's conclusions.  The ALJ gave Jones's opinion significant weight, and relied upon her opinion when formulating his RFC.  Accordingly, by relying upon Jones's conclusions, the ALJ implicitly adopted Blackwell's opinion because Blackwell reached the same conclusions as Jones.

In any event, although the ALJ did not discuss the moderate limitations assessed by Blackwell, he incorporated moderate limitations into his RFC by restricting Crawford to jobs that require an individual to understand, remember and carry out simple instructions.  *See Retana v. Astrue*, 2012 WL 1079229, *6 (D. Colo. 2012) (ALJ did not have to throughly discuss each moderate limitation; "ALJ's RFC adopted some of [doctor's] moderate limitations such as restricting plaintiff to unskilled work not involving complex tasks, reflecting plaintiff's moderate limitations in his ability to carry out detailed instruction and to maintain concentration for extended periods"); *Ryan v. Astrue*, 650 F. Supp. 2d 207, 217 (N.D.N.Y. 2009) ("despite granting little weight to [the doctor's] opinions, [the ALJ] accounted for [p]laintiff's difficulties with concentration and stress in his RFC[;] [t]herefore, had the ALJ opted to grant [the doctor] a

42

greater weight, it would not have affected his RFC").  In doing so, the ALJ discussed at length

the information contained in Crawford's treatment notes and the information contained in

Jones's report.  Nothing in the record suggests that Crawford is unable to perform unskilled

work.  Indeed, the record reflects that Crawford is able to manage her finances, children, and

household, can read, and has successfully been certified as a CNA.  Further, although Crawford

seeks ongoing treatment for symptoms of depression and post-traumatic stress disorder, those

symptoms were reasonably managed by medication until she discontinued her prescriptions

against the advice of medical providers.  I conclude that the ALJ's RFC assessment was based

upon a thorough review of the record, was supported by substantial record evidence and remand

is not appropriate.  *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) ("[n]one of the clinicians

who examined [claimant] indicated that she had anything more than moderate limitations in her

work-related functioning, and most reported less severe limitations[;] [a]lthough there was some

conflicting medical evidence, the ALJ's determination that [p]etitioner could perform her

previous unskilled work was well supported").

       Equally unavailing are Crawford's arguments that Jones's evaluation should be

rejected on the grounds that it is internally inconsistent or that it ignores Crawford's cognitive

deficits.  (Docket # 13-1 at 23-26).  In her evaluation, Jones noted Crawford was able to count

and perform simple calculations, but had difficulty completing her serial threes.  (Tr. 423).  Jones

opined that Crawford's difficulty likely stemmed from her historical learning disability and not

from an inability to maintain attention and concentration.  Crawford contends that Jones's

opinion is contrary to the regulations because it discounted or ignored Crawford's cognitive

deficits.  I disagree.

Upon reviewing Jones's report, I find no support for the contention that Jones

failed to account for Crawford's cognitive abilities.  In the report, Jones noted that Crawford

attended special education classes due to learning disabilities.  After completing her examination,

Jones diagnosed Crawford with a history of learning disabilities on Axis II.  (Tr. 424).  Despite

recognizing Crawford's history of learning disabilities and acknowledging that those deficits may

have contributed to Crawford's difficulty completing her serial threes, Jones opined that

Crawford was able, among other things, to follow and understand simple directions, to perform

simple and complex tasks independently and to maintain attention and concentration.  Simply

stated, nothing in the report suggests that Jones failed to consider Crawford's cognitive

functioning.  Indeed, Jones's repeated references to Crawford's historical learning disabilities

suggest just the opposite – that Crawford's cognitive abilities were evaluated and considered by

Jones when rendering her opinion.

Similarly, I reject Crawford's argument that her inability to complete her serial

threes should have prompted the ALJ to order a consultative intelligence examination to explore

Crawford's cognitive deficits, particularly where the record contains references that Crawford

has "mild mental retardation."  (Docket # 13-1 at 24-26).  As discussed above, the ALJ has a

duty to develop the record, *see Perez v. Chater*, 77 F.3d at 47, and the failure to adequately

develop the record warrants remand.  *Rosa v. Callahan*, 168 F.3d 72, 83-83 (2d Cir. 1999).

Thus, an ALJ is required to "make every reasonable effort to obtain from the individual's treating

physician (or other treating health care provider) all medical evidence, including diagnostic tests,

necessary in order to properly make" disability determinations.  42 U.S.C. §§ 423(d)(5)(B); *see*

20 C.F.R. §§ 404.1512(d), 416.912(d).  It is well-established, however, that "where there are no

obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." *Rosa v. Callahan*, 168 F.3d at 79 n.5.

Having reviewed the record, I conclude that there are no gaps in the medical history and that remand is not required. *Bushey v. Colvin*, 552 F. App'x 97, 98 (2d Cir. 2014) ("[t]he ALJ was not required to order an IQ test in order to fully assess [claimant's] cognitive abilities, because where there are no obvious gaps in the administrative record . . . [,] the ALJ is under no obligation to seek additional information") (internal quotations omitted) (omission in original). The record reflects that Crawford successfully completed high school, in a special education setting, and was able to study for and obtain her CNA certification. Further, Crawford maintained employment in several semi-skilled positions, including as a CNA, for several years. (Tr. 32-35, 52-53, 209). Crawford reported that she is able to manage her own finances and enjoys reading as one of her hobbies. Although Crawford testified at the hearing that she does not believe that she is able to read at an appropriate level, she conceded that she is able to read a newspaper. Thus, the record does not suggest that Crawford suffers from significant cognitive impairments, and the few references in the record were insufficient to trigger the ALJ's duty to order an intelligence examination. *See Sneed v. Barnhart*, 88 F. App'x 297, 301 (10th Cir. 2004) ("[t]he isolated comments about [claimant's] possible limited intelligence, when viewed as part of the entire record, do not sufficiently raise a question about his intelligence); *Pierre v. Sullivan*, 884 F.2d 799, 803 (5th Cir. 1989) ("a few instances in the record noting diminished intelligence do not require that the ALJ order an I.Q. test in order to discharge his duty to fully and fairly develop the record"); *Prandy v. Astrue*, 2012 WL 3679329, *2 (W.D. Okla.) ("isolated references

to [claimant's] difficulties with language, mathematics, and high school courses do not suggest a

reasonable possibility of a severe impairment involving low intelligence"), *report and*

*recommendation adopted*, 2012 WL 3656509 (W.D. Okla. 2012).


## CONCLUSION

After careful review of the entire record, this Court finds that the Commissioner's

denial of SSI/DIB was based on substantial evidence and was not erroneous as a matter of law.

Accordingly, the ALJ's decision is affirmed.  For the reasons stated above, the Commissioner's

motion for judgment on the pleadings **(Docket # 12)** is **GRANTED**.  Crawford's motion for

judgment on the pleadings **(Docket # 13)** is **DENIED**, and Crawford's complaint (Docket # 1) is

dismissed with prejudice.

**IT IS SO ORDERED.**


                                        _s/Marian W. Payson_____
                                          MARIAN W. PAYSON
                                          United States Magistrate Judge


Dated:  Rochester, New York
          September __29__, 2014